## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BAYER CORPORATION AND SUBSIDIARIES,** | ) | |
| | ) | |
| **Plaintiff and Counterclaim Defendant,** | ) | |
| | ) | **CIVIL ACTION NO.  09-351** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant and Counterclaim Plaintiff.** | ) | |
| | | **Consolidated for discovery with:** |
| **BAYER-ONYX, a partnership, by BAYER HEALTHCARE LLC, its tax matters partner,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO. 08-693** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## BAYER'S OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL

Clifton B. Cates
Jeffrey B. Moeller
Ivins, Phillips & Barker Chartered
1700 Pennsylvania Ave., N.W.
6th Floor
Washington, D.C. 20006

John M. McIntyre
Reed Smith, LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

I.      INTRODUCTION ................................................................................................1

II.     LEGAL AND FACTUAL BACKGROUND ....................................................3

III.    THE PRESENT DISPUTE .................................................................................5

IV.     ARGUMENT .......................................................................................................6

        A.      As This Court Has Already Recognized, This Case Requires a Fair
                and Workable Sampling System .............................................................6

        B.      The Defendant's Insistence That Any Sampling Must Begin By
                Identifying All Business Components Reflects A Fundamental
                Misunderstanding Of The Role Of "Business Component" In the
                Statutory Scheme ...................................................................................9

        C.      Requiring Bayer to Identify And Describe Each of More Than
                100,000 Business Components Would Be Extremely Time-
                Consuming, Expensive, and Unproductive.............................................13

        D.      The Defendant's Reliance On The Generally Broad Discovery
                Rules Of The Federal Rules Of Civil Procedure Is Misplaced And
                Ignores The Specific Circumstances Of This Case..............................15

V.      CONCLUSION...................................................................................................17

## TABLE OF AUTHORITIES

### Federal Cases

Harco Holdings, Inc. v. United States, 977 F.2d 1027, 1035 (7th Cir. 1992) ...............................13

Int'l Business Machines Corp. v. United States, 343 F.2d 914, 923 (Ct. Cl. 1965) ....................12

Sirbo Holdings, Inc. v. Commissioner, 476 F.2d 981, 987 (2nd Cir. 1973) ................................12

Snap-On-Tools, Inc. v. United States, 26 Cl. Ct. 1045, 1060 (1992) ...........................................13

Stichting Pensioenfonds Voor de Gezondheid v. United States, 129 F.3d 195, 200
        (D.C. Cir. 1997) ...............................................................................................................12

### Federal Statutes

26 U.S.C. §41 ...........................................................................................................3, 4, 5, 10, 14

26 U.S.C. §174 .................................................................................................................................4

Pub. L. 106-170, §502, 113 Stat. 1860 (1999) ..............................................................................14

Tax Reform Act of 1986, Pub. L. 99-514, §231(b), 100 State. 2085, 2173 (1986) .........................4

### Federal Regulations and Rules

26 C.F.R. §1.41-4(b)(2) ...................................................................................................................5

26 C.F.R. §1.41-4(d) ...........................................................................................................5, 11, 14

26 C.F.R. §1.6001-1(a) ..................................................................................................................14

Fed.R.Civ.P.1 .................................................................................................................................15

Fed.R.Civ.P. 26 ..............................................................................................................................15

Fed.R.Civ.P. 33(a) .........................................................................................................................16

### Other Authorities

H.R. Rep. 99-841 .............................................................................................................................5

H. Rep. No. 106-478 (1999) (Conf. Rep.) ...............................................................................5, 14

S. Rep. No. 99-313 at 694-695 (1986) ............................................................................................4

Internal Revenue Service, Field Directive on the Use of Statistical and Judgment
        Sampling in Research Credit Cases (Mar. 4, 2002) ...................................................11, 15

**BAYER'S OPPOSITION TO THE DEFENDANT'S MOTION TO COMPEL**

Plaintiffs Bayer Corporation and Bayer-Onyx (collectively, "Bayer" or "Plaintiff") hereby object to and ask the Court to deny the Defendant's United States' Motion to Compel Plaintiffs to Answer Interrogatory Number 26, filed May 25, 2010 (the "Defendant's Motion"), which was accompanied by a supporting memorandum (the "Defendant's Memorandum").  In support of its opposition, Bayer respectfully states as follows:

## I.       INTRODUCTION

Less than three weeks after this Court encouraged the parties to develop a proposal to streamline the scope of this massive case and Bayer promised to propose a sampling method to do just that, the Defendant filed its Motion to Compel that is now before the Court.  Despite its mundane title and ostensibly limited objective, the Defendant's Motion actually seeks to preclude the use of a wide range of sampling methods to test the issues in this case before any method is even proposed.  It would force Bayer to investigate more than 100,000 discreet activities occurring over a 17-year period, a truly monumental task that would bring this case to a virtual standstill, dramatically increase the cost to Bayer, and ultimately do nothing to achieve what the Court has directed the parties to do.

Ever since the May 4 hearing, Bayer has been working diligently to devise a legally sound, fair, and workable sampling method for determining Bayer's entitlement to the Qualified Research Expenses ("QREs") that it claimed and that the Defendant disputes.  Any such sampling method will necessarily specify procedures to:  (1) identify representative, but manageable samples of QREs claimed by Bayer that share common characteristics; (2) test the samples according to the relevant statutory requirements; and (3) extrapolate the results of the

sample tests to the appropriate categories of QREs claimed.  Bayer has promised to submit a

meaningful sampling method proposal to the Defendant by June 30, 2010.  This is a complex

task and Bayer still has much work to do.  However, it is apparent that the Defendant does not

want to wait to see what Bayer will propose.  Rather, under the guise of compelling Bayer to

answer one interrogatory, the Defendant is seeking to essentially preclude the use of any

sampling method that Bayer might propose to the Court.

Moreover, as discussed below, the one type of sampling method the Defendant concedes

might be appropriate — by business component — is neither required by law, as the Defendant

asserts, nor by IRS administrative practice.  In fact, it is not even a sampling method at all under

the current circumstances.  Requiring Bayer to identify all business components at this point in

the case would be tantamount to requiring it to identify every piece of every research project that

Bayer conducted during the 17 credit years at issue.  Further, in this case, sampling by business

component is not a workable method.  The kind of sampling method that the Defendant

advocates would either (i) force Bayer to create a separate accounting system for QREs,

something which it is not required to do, or (ii) compel the parties to work with a sample that by

its very nature cannot readily be extrapolated to determine the validity of all QRE claimed by

Bayer, which is the whole point of the exercise.

The time for the parties to argue over which sampling method is more appropriate is after

both parties have made actual, detailed proposals and tried to work out any differences they may

have.  The Defendant's Motion is a pre-emptive strike designed to prevent Bayer from

proposing, or the Court from considering, any other method before one has even been proposed.

While granting the Defendant's Motion would cause great hardship to Bayer, denial of

the Defendant's Motion would not in any way prejudice the Defendant.  At the May 4 hearing,

the Court stated that if the parties could not come to agreement, then the Court would hold a

hearing on the matter in October.  Prior to that hearing, the parties would be given the

opportunity to brief the matter and argue their respective positions.  This argument would be

based on actual, rather than hypothetical, proposals for streamlining the case.  The Defendant

loses nothing by trying to do what the Court asked.  Further, and contrary to the Defendant's

allegation, Bayer has made considerable efforts to comply with the already onerous discovery

requests served by the Defendant, answering more than 75 discrete interrogatories and producing

more than 30,000 pages of supporting documentation.  Thus, under the present circumstances,

the Defendant's Motion is entirely premature, unfounded, and fundamentally inconsistent with

the Court's direction of May 4 that the parties work together to try to find a method for

streamlining this case.  Accordingly, Bayer asks that the Defendant's Motion be denied.

## II.     LEGAL AND FACTUAL BACKGROUND

Bayer initiated this litigation in March 2009 seeking the refund of approximately $49.2

million of federal income taxes that were overpaid by Bayer in the years 1987-1990, 1995, and

2006.[1]  The lawsuit is based on the Internal Revenue Service's complete or partial denial of

research tax credits claimed by Bayer and its subsidiaries under 26 U.S.C. §41 of the Internal

Revenue Code for those years.

Calculation of the tax credit under 26 U.S.C. §41 requires a taxpayer to determine its

qualified research expenses or QREs.  26 U.S.C. §41(a)(1).  In turn, QREs consist of certain

---

[1]     As Bayer explained at the May 4, 2010 hearing, Bayer's refund claim is likely to be increased by another $75 million on account of recent collection activity by the Internal Revenue Service.  Transcript of May 4, 2010 hearing ("Tr.") p. 15, lines 10-20.

types of expenditures connected with activities that meet the definition of "qualified research."

26 U.S.C. §41(b).  An activity is "qualified research" if it meets the following tests:

1. It must be **research** as defined by 26 U.S.C. §174;[2]

2. undertaken for the discovery of **technological information**;

3. the application of which is intended to be useful in the **development of a new or improved business component**; and

4. substantially all the activities must constitute elements of a **process of experimentation**

5. for a **permitted purpose**.

26 U.S.C. §41(d)(1).  Permitted purpose means the research relates to "(i) a new or improved function, (ii) performance, or (iii) reliability or quality." 26 U.S.C. §41(d)(3)(A).  Section 41(d), containing these five tests, was added to 26 U.S.C. §41 by the Tax Reform Act of 1986, Pub. L. 99-514, §231(b), 100 Stat. 2085, 2173 (1986), because of Congress' belief that taxpayers were claiming "virtually any expenses relating to product development" and that "many of these taxpayers do not engage in high technology activities."  S. Rep. No. 99-313, at 694-695 (1986).  Thus, 26 U.S.C. §41(d) was added to limit the credit to expenses closely related to development activities by taxpayers pursuing technological activities.  For taxpayers who meet those criteria, however, the otherwise restrictive rules of Section 41(d) allow considerable leeway by permitting such taxpayers to test their activities for qualification at the "business component"

---

[2]   In general, under 26 U.S.C. §174, an activity is research if it is intended to eliminate uncertainty concerning the development or improvement of a product.  That definition is broader than the 26 U.S.C. §41 definition of qualified research, which is further limited by application of the other tests in 26 U.S.C. §41(d), immediately below.

level.  To that end, 26 U.S.C §41(d)(2)(A) provides that the foregoing five tests are to be applied

separately with respect to each business component of the taxpayer.

      "Business component" is defined as "any product, process, computer software, technique,

formula, or invention which is to be (i) held for sale, lease, or license, or (ii) used by the taxpayer

in a trade or business of the taxpayer."  26 U.S.C. §41(d)(2)(B).  This definition is so broad as to

include anything a taxpayer might research, and so it is not itself a difficult test to meet.  Instead,

the reason for allowing the taxpayer to test activities at the business component level is that

particular activities in isolation may not clearly satisfy all the five tests unless they are

considered as part of the development or improvement of a business component.  For example,

the activities of an employee running tests on materials may qualify as part of developing a new

product or they may be routine quality control testing.  The only way to test them is to look at the

business component to which those activities pertain.

      Further liberalizing the business component test, the legislative history provides for, and

Treasury has promulgated, the so-called "shrinking-back" rule.  H.R. Rep. 99-841 at II-72 (Conf.

Rep. 1986); 26 C.F.R. §1.41-4(b)(2).  Under the shrinking-back rule, if the tests of 26 U.S.C.

§41(d)(1) are not satisfied with respect to the business component as a whole, those activities

may qualify with respect to a subset of the business component.  26 C.F.R. §1.41-4(b)(2).  This

provides additional flexibility to the taxpayer in testing its research activities and affords the

taxpayer the opportunity to demonstrate at least some QREs where none would otherwise be

available.

## III.    THE PRESENT DISPUTE

      Interrogatory No. 26 of the Defendant's First Set of Interrogatories, served on March 15,

2010, asked Bayer to "identify and describe each new or improved business component Bayer

- 5 -

contends it incurred qualified research expenses to develop during the credit years."  In Bayer's

Responses to the Defendant's First Set of Interrogatories dated April 19, 2010, Bayer interposed

the following objection to this interrogatory:

> In addition to its general objections, Bayer objects on the basis that this
> Interrogatory is overbroad and unduly burdensome without the adoption of
> a suitable sampling method.  During the credit years, Bayer estimates that
> it developed more than 100,000 business components, which Bayer's
> books and records do not, and are not required to, track individually.

At the May 4 hearing, the Court heard presentations from both Bayer and the Defendant

regarding the legal and factual issues presented in the litigation.  The Court encouraged the

parties to try to agree on a method for reducing this case to a manageable size.  Less than three

weeks later, before either side had even had preliminary discussions on how best to do so, the

Defendant filed its Motion with supporting Memorandum seeking to compel Bayer to answer

Defendant's Interrogatory No. 26.

## IV.    ARGUMENT

### A.    As This Court Has Already Recognized, This Case Requires a Fair and Workable Sampling System.

This case is vast.  It spans the years 1984 through 2006.[3]  The total QREs that were

claimed by Bayer in the 17 credit years exceed $6.8 billion, a total amount composed of literally

millions of individual expenditures.  Bayer estimates more than 100,000 "business components"

are involved.  Research was conducted at numerous sites throughout the United States.  Based on

present estimates, there are likely more than 10,000 knowledgeable individuals, all of whom are

---

[3]     Specifically: 17 "credit years" in which Bayer claimed qualified research expenses (1990-2006); 3 years in which Bayer claimed a research credit carryback from 1990 (1987-1989); and 4 base period years (1984-1988).

potential witnesses.  It is obvious that not every expense incurred at every site in every year can

be tried.

At the May 4 hearing, the Court recognized that something must be done to shrink this

case to a manageable size:

Judge Standish:

> What I'm most interested in finding out is how you can do what
> you've just been talking about.  How can you limit the number of
> sources of information so that you can come up with a definite way
> of resolving this case, and hopefully settling it?  That's what is
> important here.  This litigation could go on for years and years, if
> we're going to go through all the documents and the number of
> people that you've referred to so far.  There has to be some way of
> streamlining it, so we can get this case down to a manageable
> proportion.

Tr. p. 26, lines 13-21.  To achieve that objective, Bayer suggested a sampling system and

described its general parameters:

Mr. Cates:

> And that was the one question that the Court directed to Mr.
> LoCurto, and that is, basically, how are we going to enable you to
> get your hands around it.  As I say, we haven't come up with a
> specific method yet.  Our goal is to do so within the next two
> months.
>
> But the approach would be something like this.  We propose a
> methodology.  If we can agree on that methodology, which will
> involve some sort of sampling, we would then drill down into the
> specific QRE that is part of the sample.  And then, to make the
> entire exercise worthwhile, we will propose to the Government that
> the results of that sample be projected to the rest of the case; not
> that it be a sample taken for satisfying intellectual curiosity, but for
> resolving the entire case.

Tr. p. 47, lines 4-14.  The Court expressed its approval and asked if it needed to issue an order to

that effect:

Judge Standish:

> Now, in that connection, is there any kind of an order we should
> issue that would help you resolve that, or would you rather have
> another meeting in two months, or what is your proposal?

Tr. p. 47, lines 21-24.  Mr. Cates, on behalf of Bayer, declined the offer believing at the time,

based upon Bayer's history of cooperative dealings with the government, that it was not

necessary.  Tr. p. 47, line 25 through p. 48, line 9.

After addressing various types of sampling, their pros and cons, Mr. LoCurto, on behalf

of the Defendant, represented as follows:

> Your Honor, the United States and the attorneys at this
> table will review whatever proposal Bayer makes in good
> faith and state the United States' position in good faith.

Tr. p. 50, lines 5-8.

While Bayer (to its regret) declined the Court's offer of an immediate order, the Court

stated that it would schedule a hearing in early October to consider how to proceed on this

matter.  If by October the parties had not been able to reach agreement by September, the Court

said that it would permit them to brief and then argue the issue.  Tr. p. 50, line 9 through p. 51,

line 6.

Since the May 4 hearing, Bayer has been working diligently to devise a legally sound,

fair, and workable sampling method, and it has promised to deliver a meaningful proposal to the

Defendant by June 30.  While the devil is in the details, Bayer's general approach will be as

Bayer previewed at the hearing:  (1) identifying representative samples of QREs claimed by

Bayer, based on categories of legal and factual issues presented; (2) testing the sample QREs

according to the statutory tests; and (3) projecting the test results to all similar QREs claimed by

Bayer.  This approach could well result in a settlement of the litigation without trial.  If there

must be a trial, the issues to be resolved by the Court will be manageable and readily

ascertainable.  The sampling method would already have been established, and once the QREs

within the sample have been determined, the results would be extrapolated to all relevant QREs

according to previously-established procedures, thereby obviating the need for any further

proceedings.

Now the Defendant seems to be backtracking from its commitment to review in good

faith any sampling proposal made by Bayer.  One statement in the Defendant's Memorandum is

particularly troubling:

> To be clear, the United States does not concede that sampling is
> permissible or appropriate; that said, unless Bayer identifies its
> business components, it will be impossible to determine if
> sampling is even workable.

The Defendant's Memorandum, p. 10, n. 4.  It appears that if the Defendant loses its Motion to

define the sampling system, the Defendant may well reject sampling entirely.  If the Defendant

chooses to do so, the Court has already said that it will have an opportunity to make its case, both

in writing before and orally at the October hearing.  But until it is *known* that the parties cannot

reach agreement, they ought to make the effort.  The potential reward is simply too great to

waste the opportunity.

**B.**     **The Defendant's Insistence That Any Sampling Must Begin By
Identifying All Business Components Reflects A Fundamental
Misunderstanding Of The Role Of "Business Component" In
The Statutory Scheme.**

The principal reason that the Defendant's Motion should be denied is that it is premature.

At the very least, the Defendant should wait to see what Bayer proposes to streamline this case

and give it fair consideration before objecting to it.  In particular, the Defendant has made no

argument at all that Bayer's proposed method does not, *in fact,* represent a fair and representative

approach to dealing with this case. How could it, since it has not seen the proposal?  Instead, the

Defendant makes a strained argument that the statue disallows, *a priori,* certain hypothetical

approaches.  This is a *non-sequitur* from the language of 26 U.S.C. §41(d)(2) and it has no basis in law.  As discussed below, the Defendant's own client, the IRS, has reached a contradictory conclusion and instructs its field agents to apply the very type of sampling methods the Defendant now claims are improper under the law.

There is absolutely no statutory, regulatory, or logical support for the Defendant's claim that business component must be the starting point for designing a sample to identify what qualified research expenses are to be tested.[4]  The Defendant has confused *how* costs are to be tested for compliance with the statutory requirements — which Bayer acknowledges is with respect to business components — with *what* costs are to be tested in a particular case.  The "how" is prescribed by statute.  The "what" is a matter of case management within the sound discretion of the Court.

Business components themselves do not either qualify or not qualify for the credit.  They are not the subject of the inquiry. Activities are the items that are tested for qualification.  They are the units that need to be sampled.  Bayer's accounting system tracks expenses by "cost center," which organizes the expenses by type of activity involved.  By its Motion, the Defendant seeks to require Bayer to produce information organized according to a project-based accounting system.  The law does not require taxpayers to use any particular kind of accounting system, only that they be able to substantiate the QREs they claim.  The battle of competing accounting methods is a central one in this case, and though important for the Court to understand, should wait for a later day.  It should not be decided under the guise of a motion to compel an answer to an interrogatory.

---

[4]     Nor is there any requirement that Bayer's complaint identify business components, as the Defendant suggests it should have done.  The Defendant's Memorandum, p. 3, ¶ 4.

Bayer has already explained why using business component as the starting point for designing a sampling method undercuts the reason for using a sampling method in the first place. A sample of 100% of the activities to be sampled, here more than 100,000, is so broad as to defeat the first purpose of a sample: economy. In addition, business component would be difficult to apply as a sampling criterion, because business components are inherently dissimilar, both in scope and substance.[5]

If the parties cannot agree on a sampling method, Bayer will be able to demonstrate to the Court at the October hearing that its proposed sampling method, on a non-hypothetical basis, provides a better representation of the issues to be decided in this case. The Defendant will be able to raise its arguments against Bayer's proposed method at that time.

Finally, the Defendant's argument is inexplicable in light of the fact that its client, the IRS, has issued official guidance contradicting the approach the Defendant now claims is mandatory under the law. In its official guidance to IRS field agents auditing research credit claims, the IRS expressly instructs its agents when and how to apply sampling methods in audits of taxpayers whose accounting systems don't allow them to organize information by business component. *See* Internal Revenue Service, Field Directive on the Use of Statistical and

---

[5]     An example serves to illustrate the problem inherent in trying to extrapolate one business component's costs to another business component's costs. Assume that substantially all of the research activities claimed by a taxpayer for a particular business component, for example, the development of a new pesticide, were found not to constitute substantially all of the elements of a process of experimentation for a permitted purpose under 26 U.S.C. §41(d)(1)(C). Under the shrink-back rule of 26 C.F.R. §1.41-4(b)(2), the taxpayer would then have to re-evaluate its activities with respect to a sub-component, for example, the active ingredient of the pesticide. Using that shrunken business component, some of the research activities and associated costs might qualify. But how could those results be extrapolated to other research activities and costs? The development of another pesticide, not to mention the development of a drug to fight cancer, is apt to consist of an entirely different mix of activities and, therefore, constitute entirely different business components. It is possible that the entire effort to develop pesticide no. 2 or the anti-cancer drug might be a single, large business component that satisfied the "substantially all" test. To work, extrapolation based on business component would require a detailed factual investigation of every other business component in the universe of business components to insure similarity; otherwise, extrapolating costs from one business unit to another would be comparing apples to oranges.

Judgment Sampling in Research Credit Cases at 3 (Mar. 4, 2002).[6]  Agents are directed that "If the taxpayer adopts cost center accounting, then a sample of employees would be selected and the projects worked on by these employees would be evaluated to determine if they involved 'qualified research.'" *Id.* at 3.  This is exactly Bayer's position.  The official guidance goes on to provide a multi-page example of a sampling procedure very much like the one Bayer has in mind.  *See id.* at 9-12.  Although its client's actions are not binding on the Defendant,[7] the Defendant should at least be required to explain why its own client has concluded that the legal position espoused in its Motion is incorrect.[8]  Moreover, the government owes a duty of consistency in its actions toward similarly-situated taxpayers.  *Sirbo Holdings, Inc. v. Commissioner*, 476 F.2d 981, 987 (2d Cir. 1973) ("[T]he Commissioner has a duty of consistency toward similarly situated taxpayers"); *Int'l Business Machines Corp. v. United States*, 343 F.2d 914, 923 (Ct. Cl. 1965) ("For all tax rulings, it is important that there be like treatment to those who should be dealt with on the same basis.").  The Defendant's refusal to even consider the type of sampling method the government has applied to other similar taxpayers is in violation of this duty.

　　While internal guidance such as the above IRS Field Directive may not be cited as precedent, *see, e.g.*, *Stichting Pensioenfonds Voor de Gezondheid v. United States*, 129 F.3d 195,

---

[6]　　Attached hereto as Exhibit 1. Available at http://www.irs.gov/pub/irs-utl/field_directive_samp_method_research_credit_cases.pdf.

[7]　　It is notable, however, that the IRS guidance provides: "Counsel, as well as the Department of Justice, will support examinations which follow the Internal Revenue Manual guidelines and the techniques recommended in this paper." Internal Revenue Service, Field Directive on the Use of Statistical and Judgment Sampling in Research Credit Cases at 1 (Mar. 4, 2002).

[8]　　It is also telling that Bayer's research credit calculations have been audited dozens of times by Defendant's client, the IRS, and in its extensive information-gathering process, the IRS has never requested a list of all Bayer's business components.

200 (D.C. Cir. 1997), the Court may look to such documents produced by the IRS as an indication of proper administrative practice.  *See, e.g.*, *Vons Companies, Inc. v. United States*, 51 Fed. Cl. 1, 12 (2001) (rulings and memoranda may relied upon "as indication: (i) of the IRS' administrative practice"); *Harco Holdings, Inc. v. United States*, 977 F.2d 1027, 1035 (7th Cir. 1992) (citing private letter rulings, which may not be relied upon as precedent, as providing "evidence of administrative practice."); *Snap-On Tools, Inc. v. United States*, 26 Cl. Ct. 1045, 1060 (1992), *aff'd*, 26 F.3d 137 (Fed. Cir. 1994) (general counsel memoranda are "evidence of the Commissioner's administrative practice").  The Defendant can hardly complain if the Court reserves for itself options in administering this case that the IRS has expressly indicated represent sound administration of the tax laws.

      **C.**      **Requiring Bayer To Identify And Describe Each Of More Than 100,000 Business Components Would Be Extremely Time-Consuming, Expensive, And Unproductive.**

The preceding section sought to demonstrate why any sampling system based on business component would undermine the principal purposes of a sampling method and would not work well in any event.  In addition, it would be a huge burden in terms of time, manpower, and money, for Bayer to have to identify every component of every research project — more than 100,000 of them occurring over a period of 17 years, involving thousands of Bayer's employees.

The Defendant asserts that this very real burden is "no excuse; rather, it is an indictment of Bayer's claims" and that "Bayer has been on notice for almost 25 years that it would have to prove its claims business component-by-business component."  The Defendant's Memorandum, p. 8.  The implication of this statement is obvious: if Bayer cannot comply with the Defendant's demand, it cannot prove its case.  Nothing could be farther from the truth.

The Defendant's assertion is based on the same erroneous assumption that pervades the Defendant's Motion:  that the process of proving qualified research must *begin* with identification of the business component.  Yes, Bayer realizes that it must prove that whatever QREs are tested meet the business component requirement, but it does not have to start with business component to identify which QREs are to be tested.  Bayer is willing and able to prove that its claim is correct through the selection of an appropriate sample of claimed expenses and application of *all* the tests of 26 U.S.C. §41, including the business component test.  Because of the broad definition of business component, the business component test is the easiest test for a taxpayer to satisfy and, therefore, should present no significant limitation on Bayer's ability to prove its claim.

As noted above, Bayer's cost center accounting system does not track expenses on a business-component-by-business-component basis, and Bayer is not required to create such an accounting system for the benefit of the Defendant.  Taxpayers are required to "retain records in sufficiently usable form and detail to substantiate that the expenditures claimed are eligible for the credit," 26 C.F.R. §1.41-4(d), and to "keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income, deductions, credits, or other matters required to be shown by such person in any return of such tax or information," 26 C.F.R. §1.6001-1(a).

But there is no requirement that the records to be kept be maintained in any particular form.  Congress explicitly reaffirmed this principle in the legislative history accompanying the reenactment of the research credit in Pub. L. 106-170, §502, 113 Stat. 1860 (1999):  "The conferees also are concerned about unnecessary and costly taxpayer record-keeping burdens and reaffirm that eligibility for the credit is not intended to be contingent on meeting unreasonable

record keeping requirements." H. Rep. No. 106-478, at 132 (1999) (Conf. Rep.).  Bayer's

accounting system, based on cost centers designed to identify like functions, is more than

adequate to allow Bayer to meet its burden, and Bayer has retained those records as required by

the Treasury Regulations.  Bayer is not required to and has not, as the Defendant claims, "been

on notice for almost 25 years" that it would have to, create an entirely new accounting system

and set of records.  Even the IRS's own audit guidelines recognize that taxpayers may use cost-

center accounting systems.[9]

> ### D.     The Defendant's Reliance On The Generally Broad Discovery Rules Of The Federal Rules Of Civil Procedure Is Misplaced And Ignores The Specific Circumstances Of This Case.

On page 5 of the Defendant's Memorandum, the Defendant argues that the discovery

rules contained in the Federal Rules of Civil Procedure mean that it is entitled to the information

it seeks.  The Defendant argues that "whether or not the parties ultimately agree on an approach

for streamlining this case, nothing in the Internal Revenue Code nor the Federal Rules of Civil

Procedure gives Bayer the right to refuse to participate in discovery until a 'suitable sampling

method' is adopted."  The Defendant's Memorandum, p. 10.

Bayer acknowledges that, as a general matter, the discovery rules contained in the

Federal Rules of Civil Procedure are broad.  But they are not the only Rules of Civil Procedure

that apply here.  Rule 1 provides that "[these rules] should be construed and administered to

secure the just, *speedy*, and *inexpensive* determination of every action and proceeding" (italics

added for emphasis).  Rule 26(b)(1), which defines the general scope of discovery, begins with

an explicit limitation: "Unless otherwise limited by court order. . . ."  The Court's exhortation to

---

[9]     *See* Exhibit 1, Internal Revenue Service, Field Directive on the Use of Statistical and Judgment Sampling in Research Credit Cases at 3 (Mar. 4, 2002).

the parties on May 4 may not have been an order, but it was a strong request that the Court offered to formalize as an order.  Rule 26(b)(2)(C) allows the Court to limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues

This is a specific dispute in a specific case, and it should not be decided based solely on rules of general applicability that cut both ways.  Bayer suggests that the Defendant's Motion be judged in accordance with the following standards, which are specific to this case.  First and foremost, is the Defendant's demand consistent with the Court's exhortation that the parties work together to establish a method for streamlining the case?  Has the Defendant fairly considered Bayer's proposal for so doing?  Would the Defendant's demand that any sampling system begin with an identification of more than 100,000 business components facilitate the selection of a sampling system?  Would it facilitate the extrapolation of sampling system results to other QREs claimed by Bayer, which must be resolved in order to determine the research credits to which Bayer is entitled?  Could Bayer comply with the demand given its existing accounting system?

The Defendant's argument that Bayer is trying to hold discovery hostage is absurd and the Defendant's claim that Bayer has "refused to participate in discovery" is flatly contradicted by the facts.  To the contrary, despite the clear language in Fed. R. Civ. Pro. 33(a) specifying that parties may serve no more than 25 interrogatories, including all discrete subparts, Bayer has responded to all of the more than 75 interrogatories (including discreet subparts) posed by the Defendant.  The Defendant has never sought leave of Court to exceed the limits set forth in Rule 33(a).

Moreover, Bayer has already produced more than 30,000 pages of documents that were responsive to the Defendant's voluminous requests for production.  In addition, Bayer has collected well over 1,000,000 pages of confidential documents that it is prepared to turn over once the appropriate protective order is in place.  Finally, Bayer is working diligently to gather more information that is responsive to the government's many requests.  The Defendant's statement that Bayer has refused to participate in discovery is both baseless and offensive.

## V.        CONCLUSION

At the May 4 hearing, the Court exhorted the parties to work together to try to devise a method to streamline this massive case.  To that end Bayer promised the Court that it would propose a workable sampling system, and Defendant pledged that it would consider in good faith whatever Bayer proposed.  Yet shortly after the hearing and before Bayer has proposed anything, the Defendant filed its Motion, in effect objecting to what the Defendant has not even seen.

What the Defendant seeks to compel would defeat the principal purpose of a sampling system, because it would require Bayer to identify more than 100,000 separate business components before doing anything else.  Identifying the universe of research activities in all of their constituent parts over a 17-year period is hardly a sample.  Doing so would be monumentally time-consuming and expensive, and it would result in a substantial delay of this case.  Time and money aside, it would not even be a productive exercise, because the results of such an approach could not easily be projected to answer the ultimate question in this case:  what were Bayer's QREs in each year?

There is no requirement in the law, logic, or statistics that any sampling system begin with business component.  The most benign explanation of the Defendant's Motion is that it is based on a misunderstanding of the role of business component in the statutory scheme.

Finally and most significantly, the Defendant's Motion is inconsistent with the Court's exhortation that the work together to try to devise a method for streamlining this case.  Bayer is trying to do so.  At the very least the Defendant should wait to see what Bayer proposes.   It will not be prejudiced in any way.  If the Defendant wants to object to Bayer's proposal, the Court has already said it can — at a hearing to be conducted in October.

For all of the foregoing reasons, the Court should deny the Defendant's Motion and direct the parties to follow its clear instructions of May 4.

Respectfully submitted,

*Counsel for Plaintiff*

/s/ Clifton B. Cates
Clifton B. Cates
Jeffrey B. Moeller
Ivins, Phillips & Barker Chartered
1700 Pennsylvania Ave., N.W.
6th Floor
Washington, D.C. 20006
Telephone:  (202) 393-7600
Facsimile: (202) 393-7601
cates@ipbtax.com
jmoeller@ipbtax.com

 /s/ John M. McIntyre
John M. McIntyre
PA I.D. No. 78739
Reed Smith LLP
Alexandria C. Samuel
PA I.D. No 207087
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
Telephone: (412) 288-3822
Facsimile: (412) 288-3063
jmcintyre@reedmith.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing was served through the Court's electronic transmission

facilities this 8th day of June 2010 upon the following counsel of record:

        Jan M. Geht
        John J. LoCurto
        Yonatan Gelblum
        Tax Division
        U. S. Department of Justice
        Post Office Box 227
        Washington, DC  20044

        Jennifer R. Andrade
        United States Attorney's Office
        700 Grant Street, Suite 4000
        Pittsburgh, PA 15219

        /s/ John M. McIntyre
        Counsel for Plaintiffs